## STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY,

### AND PREROGATIVE COURT,

### NOVEMBER TERM, 1888.

45 139
70L 560

THE DELAWARE BAY AND CAPE MAY RAILROAD COMPANY,.
appellant,

*v.*

EDWIN MARKLEY, respondent.

1. The act (*Rev. Sup. p. 834 ₹ 42*) authorizing the chancellor to appoint a receiver if a railroad neglects to run daily trains, confers such power upon the court of chancery and not upon the chancellor in his personal capacity.

2. The chancellor can refer, in the ordinary course, such matter to a vice-chancellor or to a master for hearing and an advisory opinion.

3. A vice-chancellor cannot entertain jurisdiction over a case except when referred to him by general or special order.

4. But when the case was heard by the vice-chancellor without objection,. and the chancellor adopted his advice and signed a decree—*Held*, that it was too late to raise on appeal the question as to the vice-chancellor's right to hear the case.

5. The proviso in the act above referred to exempting sea-side railroads from the regulation of the body of the act, held to be constitutional.

On appeal from an order advised by Vice-Chancellor Bird, who filed the following conclusions :

This company was organized under the General Railroad law passed in 1873 (*Rev. p. 925* §§ *89, 90*). It declared its purpose to be doing general business in the transportation of passengers and freight. It constructed its road from Cape May City to the steamboat landing, in all less than four miles in length. It passed through the village of Cape May, where two hundred to three hundred inhabitants reside permanently, and where several hundreds more reside in the Summer. Whether many or few cannot be material. This village is commonly called a summer or sea-side resort, although it is not entirely deserted or abandoned in the winter season any more than many other places on the coast of New Jersey. One great object, certainly the main object, in building the road was to carry the passengers which should be brought to the steamboat landing by the steamer "Republic" from Philadelphia. This steamer only runs during the summer season. While to receive and carry these passengers was the chief object, its declared purpose was not only to carry freight, but it has actually carried freight from Cape May City to Cape May.

It commenced operations in the year 1879, and continued to run its trains over the entire length of the route until 1883, during the entire year. At times since then it has not been operated all the year.

The petition shows that the road has not been operated for more than ten days, and asks for the appointment of a receiver to take possession of said road and to transact the ordinary business thereof in the transportation of freight and passengers for such time as the court may direct, according to the act of February 12th, 1874 (*Rev. p. 943* § *160*).

In resisting this application the defendant relies upon the provisions of the act of March 3d, 1880 (*Rev. Sup. p. 834* § *42*),

which provides that "any railroad company whose road is constructed at any sea-side resort, not exceeding four miles in length, and which was built and intended merely for the transportation of summer travelers and tourists, shall be excepted from the operation of the act of February 12th, 1874" (*supra*), and also upon the allegation that it was never intended to be a general freight and passenger road, but only a passenger road to be operated during the summer season.

With great respect to the counsel who pressed the latter point, I must remark that it seems to me to be of no consequence what the secret motive and intention of the corporators was. The law declared the conditions upon which they should or could build a railroad. In form and in such articles as the law prescribes, those corporators accepted the conditions and declared their intentions, which were in harmony with the conditions. Now, if under a pressure, of any nature whatever, they can so far forget their solemn obligations to the public which has granted to them these peculiar privileges, and guaranteed to protect them in the right use of them, as to insist that the law of 1873 is not binding, and that their own declared intentions are not binding beyond their own mere will, they certainly ought not to expect any court to concur with them in such insistment. As the law stood when this road commenced operations, it was the duty of the company to transport passengers and freight by running trains over its road daily. It strikes me that any other conclusion, if acted upon, would lead to the most dangerous and destructive consequences; thousands of hundreds of thousands, even millions of dollars' worth of property might be involved, at the option of a company.

But the act of February 12th, 1874, was amended by an act of March 3d, 1880 (*Rev. Sup. p. 834 § 42*), which provides that the act directing the appointment of a receiver shall not apply to roads built at sea-side resorts (set out fully above). Can this provision be claimed as a protection to the defendant company? I think not. It was not enacted until after the road had been built and operated. There is nothing in the language of the act indicating the slightest intention of the legislature to bring within its provisions any of the numerous roads which had then been

constructed between Cape May and Sandy Hook, and the only facts in connection with this road that seem to have any relation to the law are, that it is less than four miles in length, and that there are two towns, one at one end and one through which it passes, properly called summer resorts, and that tourists visit them, all of which, except the first, i. e., the length, may be said of many others. I do not feel myself at liberty to give this provision any retrospective operation. I am sustained in this view by the case of *Williamson* v. *New Jersey Southern R. R. Co.*, 2 Stew. Eq. 311; *Elizabeth* v. *Hill*, 10 Vr. 555; *Berdan* v. *Van Riper*, 1 Harr. 7, 14; *McGovern* v. *Connell*, 14 Vr. 106. See the explicit language of the court of errors, in *Citizens Gas Co.* v. *Alden*, 15 Vr. 648, 653, 654.

These railroads are made lawful, and have extraordinary privileges as well for the benefit and convenience of the public as for the profit of the corporators or their assigns. And if by the construction of them the company acquire vested rights, so, too, do the public acquire vested interests. Therefore, when individuals avail themselves of the inducements offered by these railroads to invest their capital in homes, or land for improvement, or in business, they have as high and sacred a claim to the consideration of the court as the railroad company. This observation is applicable to this case, for money has been invested in homes, for residences the year through (not simply for the summer season) at Cape May, and the owners and others reside there the entire year, and they and others carry on business there. Hence it is very obvious that Cape May is no more a sea-side resort or a resort for summer than is a score of other places on our coast.

The views thus expressed make it unnecessary for me to dwell at length upon the constitutionality of the law under which the defendant seeks favor. It is urged that the proviso of the act in question is prohibited by that clause of the constitution, in article 4, section 7, which declares that the legislature shall not pass any private, special or local law "granting to any corporation, association or individual any exclusive privilege, or immunity, or franchise whatever." Without fully discussing

Delaware Bay and Cape May R. R. Co. v. Markley.

the question, I cannot but ask what general principle is involved in the idea of a road less than four miles in length. What general good would such an enactment promote? If such a law is not in conflict with the constitution, then any railroad company can secure to itself such rights and immunities, whatever its length may be, for if the power exists in case the road is less than four miles, it certainly exists in every conceivable case when distance only is concerned.

But it is said that another fact is to be noticed, i. e., that the law under consideration provides that it shall apply to roads built " at sea-side resorts," and " merely for the transportation of summer travelers and tourists," and that these are such general phrases as fairly to avoid the prohibition of the constitution. The first phrase quoted may well enough be construed to apply to all sea-side resorts, but leaving the court to define what is or is not comprehended therein—whether a place wholly or only partially abandoned during a part of the year. I cannot but think that every court would say that it must appear affirmatively, in every such case, that the place was wholly abandoned at the time the company ceased its operations.

But it seems to me that it is enough to say that the road in question was not established or organized on any such principles, for when so organized there was no law authorizing such a corporation.

Unless the company commence operations and run their trains to carry both freight and passengers within five days from the time a copy of the order to be made in this case shall have been served upon one of its officers, I shall advise the appointment of a receiver to operate the said road under the statute.

And, upon a rehearing, filed the following additional conclusions:

I consented to rehear this case. The defendants came in and said that they had been surprised, and expressed the conviction that all the points which they were entitled to be heard upon had not been fully presented to nor considered by the court;

either of which, in matters of so much importance, is sufficient to warrant the court in hearing a re-argument.

The first point presented in resistance to the petition is, that the court has not jurisdiction, because of the person or officer of the court to whom the petition was presented and before whom the argument was had. Clearly, this point in the case should be disposed of at the threshold. It is quite useless for the court to climb and club unless it can collect and conserve the fruit of those labors. It is said that, in such a case, the application must be made to the chancellor, and because that is the direction of the statute, the petition cannot be presented to a vice-chancellor, nor heard by him. The defendants did not see fit to depend upon this want of jurisdiction, but presented themselves before the vice-chancellor, following the counsel of the petitioner in an elaborate effort, by the production of witnesses, and argument in resistance to the insistment of the petitioner, thus casting their case and all the consequences thereof upon the court, without once questioning the right or power of the vice-chancellor to hear the case for the chancellor, and to advise an order or decree therein. Therefore it might, with great propriety, be said, that the question of jurisdiction is presented too late to receive the attention of the court. But, if the objection is to be considered at all, it may well be asked, Why is it claimed that there is any distinction between the chancellor and the court of chancery ? It may well be asked whether or not the chancellor can do anything except as he represents the court of chancery, or whether he can do anything in the court of chancery except he does it as chancellor ? I am unable to make any distinction whatever between authority conferred upon the chancellor and authority conferred upon the court of chancery, when the authority conferred pertains to the exercise of equitable or judicial powers or functions. The constitution says " that the court of chancery shall consist of a chancellor." Now, if the chancellor is called upon to act in any judicial capacity whatsoever by that name, he can only act as the head or representative of the court of chancery.

In the next place, it is claimed that this authority conferred being personal or individual, the chancellor cannot delegate the

power; it inheres in him alone by express legislation. Not more so, certainly, than any other act which he is called upon to perform in his capacity as chancellor with reference to the court of chancery. The act creating vice-chancellors declares that the chancellor may refer to the vice-chancellor any cause or other matter which may at any time be pending in the court of chancery, to hear the same for the chancellor. Now, this particular matter is pending in the court of chancery, and the chancellor, under this act, had a right to refer it to a vice-chancellor, to be heard, not for the court of chancery, but to be heard for the chancellor. The same act provides that "the chancellor may make all such general rules for the effectual execution and carrying out of this act as he shall deem necessary and proper." And the eleventh rule of the court of chancery provides for motion-days, fixing time and place, and declares that all motions on such days can be heard by the chancellor, or one of the vice-chancellors, one of whom will attend for that purpose. This particular matter was first presented upon a motion-day, and the hearing commenced before one of the vice-chancellors upon such motion-day. It was, like every such case, heard for the chancellor, and if an order or decree be advised by the vice-chancellor and signed by the chancellor, it will become effectual, not because it was heard by the vice-chancellor, for and on his own account as such vice-chancellor, but because it was and is signed by the chancellor, as such, by force of the provision of the act of the legislature, establishing and authorizing such action upon the part of the vice-chancellors, becoming, thereby, the acts of the chancellor himself, as effectually, to all intents and purposes, as though he had heard the case himself from the beginning.

Upon this same branch of the discussion, it is insisted that all the labor which has been had in this case, and which must follow if these proceedings now instituted be continued, has been and will be for naught: because the case is being heard in the court of chancery, and not by the chancellor; and being so heard in the court of chancery, every step is nugatory and void; and that if the chancellor were to attempt to recognize or enforce it, he could not do so because of the fact that it is an effort of the court

of chancery to perform an obligation which the statute has imposed only upon the chancellor. The effort is to make it appear that the head is no part of the body.

That I regard the other points discussed on the rehearing of great importance, is shown by the fact that I, at once, allowed the rehearing; but, upon a careful consideration, my judgment still is the same as expressed in my former conclusions.

*Mr. H. W. Edmunds* and *Mr. S. H. Grey*, for the appellant.

*Mr. William T. Hilliard*, for the respondent.

The opinion of the court was delivered by

BEASLEY, C. J.

The appellant was organized, by virtue of the General Railroad act of this state, to construct a railroad of less than four miles in length from a point on the Delaware river called "Steamboat Landing" to the city of Cape May. In pursuance of the authority thus obtained the road was built and completed in the year 1879. In the month of October, 1887, the respondent, a resident of Cape May Point, in this state, filed his petition to the chancellor, representing that this company had failed and neglected, for the space of ten days then last past, to run daily trains on its road, and praying that a receiver should be appointed, pursuant to the statute (*Rev. Sup. p. 834 § 42*). The chancellor made an order that the application should be heard, after proper notice given. The appellant put in its sworn answer, and, at the time designated, the motion was heard on the petition, answer, affidavits and oral proofs. The defence interposed to the petition was, that the road of the appellant was constructed at a sea-side resort, did not exceed four miles in length, and was built and intended merely for the transportation of summer travelers and tourists, and that it was, consequently, within the proviso of the act requiring the running of daily trains. The vice-chancellor advised the appointment of a receiver, and the chancellor accordingly signed the requisite order, which is the decree appealed from.

The first exception taken to this proceeding was, that the chancellor had no power to delegate to the vice-chancellor the duty of appointing a receiver. The contention in support of this proposition is, that the power in question is conferred, not upon the court of chancery, but upon the chancellor himself as an individual, his official appellation being used simply as *designatio personæ*.

If this postulate is to be yielded, it would follow, as an inevitable consequence, that the statutory function in question would have to be discharged by the chancellor, for he would be a mere commissioner empowered to do a special act, and it is obvious that such an authority could not be delegated.

But we think such is not the proper construction of this statute. All through our legislative acts, when power has been conferred upon the court of chancery, it has been the frequent practice to vest such power, descriptively, in the chancellor, his official designation being used as a synonym for that of his court. It is true that, in the line of this usage, ambiguities may obtain, making it difficult to decide whether the court or the individual were designed to be the depositary of the power in the particular case. But no such obscurity prevails in the present instance, for we have but to look at the nature of the act required to be done to be convinced that it was the legislative design to call upon the court of chancery to effectuate the purpose in view. The very name of "receiver" implies a person deriving his authority from the court of chancery; for a receiver is one of the well-known agents of that tribunal, with his powers, immunities and responsibilities entirely defined; he is answerable to the court for each of his acts, and is completely under its supervision and control. On the other hand, if such receiver is to be appointed by the chancellor in his personal capacity, by the act of appointment the chancellor would become *functus officio;* he would have no superintendence over the conduct of the officer thus selected by him, nor could he revoke the appointment, even though the necessity for a receivership had ceased. From these and the like considerations, we are of opinion that it was plainly the legislative intention to lodge the appointing power in these

cases in the court of chancery. The consequence being that it was lawful for the chancellor to refer the present litigation to either of the vice-chancellors or to a master in chancery for consideration and advice in the usual course.

The second objection to the proceedings is, that, even on the assumption that the jurisdiction in the matter just considered was vested in the court of chancery, still the vice-chancellor was without power to act when and as he did, because the chancellor did not refer the cause to him.

There can be no doubt that the vice-chancellor cannot assume jurisdiction over a cause except by force of a reference made by the chancellor to that effect. And, as the rules of the court are now framed, there does not appear to be any power given to the vice-chancellors to take cognizance of causes so as to finally dispose of them, upon the merits, except when there exists a special order for that purpose. In the present instance this was not done, and the consequence is the hearing by the vice-chancellor was irregular, and would have been, if properly objected to, entirely nugatory. The course pursued was this: The counsel of petitioner, on a regular motion-day before the vice-chancellor, presented this petition, and moved for a day to be set for the hearing; upon the advice of the vice-chancellor, an order was signed by the chancellor, requiring the appellant to show cause on a certain day why the prayer of the petition should not be granted and a receiver appointed, and requiring a notice of such hearing to be served on the appellant. On the appointed day, the motion was heard before the vice-chancellor (who had not been appointed to the duty); both parties produced their witnesses, and presented their arguments; the first objection to the jurisdiction assumed by the vice-chancellor being taken on this appeal.

Under these circumstances, we think this exception must fall to the ground. It comes too late, the parties having, by their acquiescence, waived the mistake in question, which must be deemed a mere irregularity, since the chancellor had ratified, before objection, the procedure by his final decree.

The next and last objection involves the merits of the case.

Delaware Bay and Cape May R. R. Co. *v.* Markley.

As already stated, this procedure is based on the act to be found in the *Rev. Sup. p. 834 § 42.* Its general provision is thus expressed, viz.:

"That if any railroad in this state *has,* or *may hereafter,* fail or neglect to run daily trains on any part of its road for the space of ten days, then the chancellor of this state, upon petition of any citizen of this state, and due proof of the facts, shall speedily appoint a receiver" &c.

And then follows the following clause:

"Provided, that this act shall not apply to any railroad company whose road *is* constructed at any sea-side resort, not exceeding four miles in length, and which *was built* and intended merely for the transportation of summer travelers and tourists."

In the present case, the appellant has shown, in the clearest manner, that, in point of fact, its road is exactly one of those described in this proviso; it is less than four miles in length; is at a sea-side resort; was designed to be and was a mere adjunct of a boat running in the summer season from Philadelphia, and was used merely, except incidentally, for the transportation of "summer travelers and tourists." We think, therefore, that the appellant has, under the evidence, demonstrated that it stands within the definition of this proviso, if such proviso applies to roads already in existence at the time of its enactment.

The vice-chancellor was of opinion that this exceptive clause did not apply to the appellant's road, because it was built before the passage of the law, and he declared that he did not feel himself at liberty to give this provision any retrospective operation.

But this interpretation appears to us to be in plain repugnancy, not only to the spirit, but to the language of the statute. In its first line this is manifest, for it declares that its summary processes are to apply not only to roads that thereafter should fail to run their daily trains, but also to roads that had, before the passage of the law, failed so to do; and the proviso, by its strict terms, is made applicable exclusively to a road which, to use the statutory expressions, "*is* constructed," and which "*was* built and intended" &c.; plainly designating, if we look to terms

alone, roads already in existence, and not those which might come into existence at a future time.

It is further to be remarked that a construction of this act that would limit its operation to railroads built before its passage, and which, consequently, should withhold its immunities from similar roads subsequently built, would make it, in a very plain manner, unconstitutional, as such a law would be special and not general, for it would obviously not embrace a complete class.

It seems to us that this act is operative on all railroads having the designated characteristics, without reference to the time of their construction.    To this extent the contention of the appellant must prevail.

But the principal objection against the appellant's case, in the mind of the vice-chancellor, appears to have been, that it was estopped by the form of its application for incorporation under the General Railroad law from setting up that it was built for the special purpose of carrying summer travelers to a sea-side resort. The judicial language upon this subject is : " The law declared the conditions upon which they should or could build a railroad. In form and in such articles as the law prescribes, these corporators accepted the conditions and declared their intentions, which were in harmony with the conditions ;" and the inference is drawn that such " solemn obligations " are binding on the corporation.    The theory seems to be that, as the appellant originally accepted a charter, which by force of its terms and existing legal principles compelled it to run trains at all seasons, it is not competent for it now to maintain that it need run its trains only in the summer-time.

It will be observed at once that if this position be tenable, the proviso in the act of 1880 becomes a dead letter, as there would be no subject for it to operate upon, for every railroad that now exists, or that may hereafter exist, stands, or will stand, pledged, so far as relates to the language of its charter, to run its trains, not at particular seasons, but at all times.    Such, undoubtedly, are the obligations assumed on the part of these companies by the form of their respective charters, whether specially incorporated or organized under the General Railroad act, and,

consequently, if on account of such an obligation the present appellant cannot claim the dispensations of the proviso in question, neither can any other of these corporate bodies make such claim, the result being that such proviso would be left without operative force.

The fallacy of the rule adopted arises from the fact that this appellant was regarded as having deliberately assumed a public duty, and as now attempting to modify and limit such duty, leaving out of the account the vital circumstance, that the legislative authority sanctioned such action. Granting that the appellant, by the act of becoming incorporated, solemnly agreed with the public to run its trains every day in the year, and that the legislature subsequently released it of a portion of such duty, it does not seem questionable that such a remission would be legal. The obligation to run trains being due to the public, it was plainly competent for the legislature to surrender or release it in whole or in part. The appellant, therefore, could consistently resort to the proviso in question for its protection.

But it was argued, and the position appears to have been favored by the vice-chancellor, that this proviso was void, inasmuch as it was a special law conferring corporate privileges—a form of legislation forbidden by the constitution of this state.

In approaching this inquiry it is proper to premise that to sustain this proposition would be, in effect, to lay a ground for the dismissal of the petition in this case that seeks the appointment of a receiver; for, if this proviso is not sustainable, the body of the act must fall with it, as the one cannot be separated from the other without a perversion of the legislative design. Looking at the complete act, we find a purpose not to extend its requirements to a certain class of railroads, and if we suppress the proviso, in violation of such expressed purpose, we extend it to such excepted class; manifestly, therefore, the proviso cannot be suppressed and the residue of the act retained and enforced in its mutilated condition. Consequently, when the conclusion was reached in the court below that the proviso was in conflict with the constitution, the application for a receivership should have

been refused on the ground that the entire proceeding was destitute of all statutory basis.

But, in the opinion of this court, the statutory clause thus challenged is not to be invalidated on constitutional grounds. The regulation established by it constitutes, on well-settled principles, a general and not a special law, as the objects of it form a distinct class, and the legislation in question appertains to the characteristics on which such classification rests. These inconsiderable roads, which are mere appendages to sea-side resorts, and which cannot be run with essential advantage, in view of either public or private interests, except during short periods of the year, differ materially from the ordinary railroads of the state that have been established as the perpetual highways of travel and commerce. The difference between these two groups of instrumentalities is so marked that it is obvious they cannot be subjected to the same public rule, for a regulation requiring one set of them to be operated without cessation would be not only reasonable but absolutely necessary for the welfare of the community, while in its application to the other set it would bring about a mere waste and destruction of private property. We think, therefore, that these sea-side roads stand sufficiently aloof for the purposes of legislative classification and particular regulation. Nor does it appear to us that it was legally objectionable for the legislature to constitute this special class by a reference to the length of the roads for the purpose of classification. The roads could be grouped in no other way, and, looking at the definition of the objects to which this proviso is to be applied, we cannot say that it is either too broad or too narrow, for it appears to embrace the whole of the class to which it properly relates, and nothing more.

The result is that the proviso should have been held to shield the appellant from the entire procedure.

Let the decree be reversed, and the petition dismissed.

*Decree unanimously reversed.*